**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| ANDREA MIYAHIRA, Individually and On Behalf of All Others Similarly Situated, | ) CASE NO. |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| VITACOST.COM, INC., IRA P. KERKER, RICHARD P. SMITH, STEWART GITLER, ALLEN S. JOSEPHS, DAVID N. ILFELD, LAWRENCE A. PABST, ERAN EZRA, and ROBERT G. TRAPP, | ) |
| | ) |
| Defendants. | ) |
| | ) JURY TRIAL DEMANDED |

**CLASS ACTION COMPLAINT**

By and through his undersigned counsel, Plaintiff Andrea Miyahira ("Plaintiff") alleges the following against Vitacost.com, Inc. ("Vitacost" or the "Company") and certain of the Company's officers and directors, and certain entities that served as managers of the Company's initial public offering.

Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by Vitacost and other related parties and non-parties with the Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles, shareholder communications, and postings on Vitacost's website concerning the Company's public

statements; and (d) review of other publicly available information concerning Vitacost, the other Defendants and related non-parties.

## I.   <u>NATURE OF THE ACTION</u>

1.      This is a federal securities class action against Vitacost and certain of its officers and/or directors for violations of the federal securities laws.  Plaintiff brings this action on behalf of all persons or entities that purchased shares of Vitacost common stock between September 24, 2009 and April 20, 2010, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").  The Exchange Act claims allege that Defendants engaged in a fraudulent scheme to artificially inflate the Company's stock price.  As a result of the fraud described below, the Company has lost a substantial portion of its value.

2.      The action is also brought on behalf of all persons or entities who purchased shares of Vitacost common stock pursuant and/or traceable to the Company's Initial Public Offering for the sale of Vitacost common stock at a price of $12.00 per share, commencing on or about September 24, 2009 (the "IPO"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act").  Under the Securities Act, Defendants are strictly liable for the material misstatements in the Offering Documents (as defined below) for this public stock offering, and these claims specifically exclude any allegations of knowledge or scienter.  The Securities Act claims also expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

3.      The Complaint alleges that, in Vitacost's Offering Documents and throughout the Class Period, Defendants failed to disclose material adverse facts about the Company's financial well-being and future prospects.  As a result of Defendants' wrongful acts, false and misleading

2

statements and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## II.   <u>JURISDICTION AND VENUE</u>

4.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78(i)(b), 78(t) and 78t-1(a) and pendent common law claims, and §§11 and 15 of the Securities Act, 15 U.S.C. §§77k and 77o.

5.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1307 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

6.      The Court has personal jurisdiction over this action because Vitacost does business in this District.

7.      Venue is proper in this Judicial District pursuant to §22 of the Securities Act and pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District. Additionally, the Company maintains executive offices within this Judicial District, a substantial portion of the Company's loans during the Class Period originated within this Judicial District, and Defendants have received substantial compensation in this Judicial District by doing business here and engaging in numerous activities that had an effect in this Judicial District.

8.      In connection with the acts and omissions alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

III.    THE SECURITIES ACT CLAIMS

    A.    PARTIES

        i.    Plaintiff

9.    Plaintiff Andrea Miyahira, as set forth in the accompanying certification and incorporated by reference herein, purchased the publicly traded securities of Vitacost, traceable to the Company's IPO, at artificially inflated prices during the Class Period and has been damaged thereby.

        ii.    Securities Act Defendants

        (a)    The Company

10.    Defendant Vitacost is a corporation incorporated under the laws of Delaware with headquarters in Florida.  During the Class Period, Vitacost maintained executive offices at 5400 Broken Sound Blvd. NW, Suite 500, Boca Raton, FL.

        (b)    The Officer and Director Defendants

11.    Defendant Ira P. Kerker ("Kerker") served as the Chief Executive Officer and a director of the Company at all relevant times herein.  Defendant Kerker signed the Company's Registration Statement in connection with its IPO.

12.    Defendant Richard P. Smith ("Smith") served as the Chief Financial and Accounting Officer of the Company at all relevant times.   Defendant Smith signed the Company's Registration Statement in connection with its IPO.

13.    Defendant Stewart Gitler ("Gitler") served as the Chairman of the Board of Directors of the Company at all relevant times.   Defendant Gitler signed the Company's Registration Statement in connection with its IPO.

14.     Defendant Allen S. Josephs ("Josephs") served as the Director of Research and a director of the Company at all relevant times.  Defendant Josephs signed the Company's Registration Statement in connection with its IPO.

15.     Defendant David N. Ilfeld ("Ilfeld") served as a director of the Company at all relevant times.  Defendant Ilfeld signed the Company's Registration Statement in connection with its IPO.

16.     Defendant Lawrence A. Pabst ("Pabst") served as a director of the Company at all relevant times.  Defendant Pabst signed the Company's Registration Statement in connection with its IPO.

17.     Defendant Eran Ezra ("Ezra") served as a director of the Company at all relevant times.  Defendant Ezra signed the Company's Registration Statement in connection with its IPO.

18.     Defendant Robert G. Trapp ("Trapp") served as a director of the Company at all relevant times.  Defendant Trapp signed the Company's Registration Statement in connection with its IPO.

19.     Defendants Kerker, Smith, Gitler, Josephs, Ilfeld, Pabst, Ezra and Trapp are collectively referred to as the "Officer and Director Defendants."  The Officer and Director Defendants served as Vitacost's officers and/or directors during the Class Period, and are strictly liable under the Securities Act for endorsing the Company's false statements in the IPO Offering Documents.

20.     Vitacost and the Officer and Director Defendants are collectively referred to as the "Securities Act Defendants."

### B.     CLAIMS AGAINST THE SECURITIES ACT DEFENDANTS

21.    On September 24, 2009, Vitacost filed a Form S-1/A Registration Statement (the "Registration Statement") with the SEC in connection with the IPO for the sale of the Company's shares at a price of $12.00 per share.  On or about September 24, 2009, the Prospectus (the "Prospectus" and, collectively with the Registration Statement, the "Offering Documents") with respect to the IPO, which forms part of the Registration Statement, became effective.

22.    Both the Company and certain selling stockholders sold shares in the IPO, which provided net proceeds of $11.16 per share after underwriting expenses.  The Company sold 4,428,445 shares for net proceeds of $49,421,446.  The selling stockholders, including certain of the Securities Act Defendants, sold 6,571,555 shares for net proceeds of $73,338,553.

23.    The Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing its preparation.

24.    With respect to the Company's growth strategy, the Offering Documents stated:

Our Growth Strategy

We have designed a growth strategy that we believe will increase net sales while maintaining or increasing our gross margins.  For the year ended December 31, 2008, we recorded net sales of $143.6 million and an overall gross margin of approximately 27%.  For the same period, our gross margin was approximately 53% on sales of our proprietary products and approximately 24% on sales of our third-party products.  During the first six months of 2009, our overall gross margin increased to approximately 32%.

25.    The statements in the Offering Documents were materially false and misleading because they failed to disclose: (1) that the Company was starting a product-mix shift away from the high-margin proprietary products, which would negatively impact the Company's growth

strategy; (2) that the Company inflated demand for its proprietary products; (3) that the Company was pushing out excess product to customers so that it could mask declining demand; (4) that the Company was experiencing logistical issues at its own plants; (5) that the Company lacked significant oversight processes and procedures and utilized ineffective operations software, despite knowing that those issues existed; (6) that as a result of this, the Company's financial results were materially inflated at all relevant times; (7) that the Company lacked adequate internal and financial controls; and (8) that the Company's projections regarding future growth lacked in any reasonable basis when made.

## IV.    COUNTS AGAINST DEFENDANTS RELATED TO THE IPO

### COUNT I
### FOR VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT
### AGAINST THE SECURITIES ACT DEFENDANTS

26.    Plaintiff incorporates the allegations contained above pertaining to the false Offering Documents.  Plaintiff repeats and alleges Sections I, II, III, VI.A., and XIII, as if fully set forth herein.  For purposes of Counts I and II, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as these counts are based solely on claims of strict liability and/or negligence under the Securities Act.

27.    This Count is brought against the Securities Act Defendants on behalf of all persons or entities who purchased Vitacost stock issued pursuant or traceable to the September 24, 2009 IPO.  The Offering Documents for the IPO were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed adequately to disclose material facts, as described above.

28.     The Securities Act Defendants are strictly liable for the misstatements and omissions and for the damages that Plaintiff and other members of the Class have sustained thereby.  The Securities Act Defendants are responsible for the contents and dissemination of the Offering Documents, and did not conduct a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

29.     The Securities Act Defendants issued, caused to be issued and participated in the issuance of materially false and misleading written statements to the investing public that were contained in the Offering Documents, which misrepresented or failed to disclose, among other things, the facts set forth above.  By reasons of the conduct herein alleged, each Section 11 Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

<u>COUNT II</u>
**FOR VIOLATIONS OF SECTION 12(a)(2) OF THE SECURITIES ACT
AGAINST THE SECURITIES ACT DEFENDANTS**

30.     Plaintiff incorporates the allegations contained above pertaining to the false Offering Documents.  Plaintiff repeats and alleges Sections I, II, III, VI.A., and XIII, as if fully set forth herein.  For purposes of Counts I and II, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as these counts are based solely on claims of strict liability and/or negligence under the Securities Act.

31.     This Count is brought against the Securities Act Defendants on behalf of all persons or entities who purchased Vitacost stock issued pursuant or traceable to the September 24, 2009 IPO.  The Securities Act Defendants were sellers, offerors, and/or solicitors of purchasers of the shares offered pursuant to the Offering Documents.

32.     The Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts.   The Securities Act Defendants' actions of solicitation included participating in the preparation and dissemination of the false the misleading Offering Documents.

33.     The Securities Act Defendants owed to the purchasers of Vitacost's common stock, including Plaintiff and other members of the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  The Securities Act Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Offering Documents, as set forth above.

34.     Plaintiff and other members of the Class purchased or otherwise acquired Vitacost's securities pursuant to and/or traceable to the defective Offering Documents.  Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Offering Documents.

35.     Plaintiff, individually and representatively, hereby offers to tender to the Securities Act Defendants that stock which Plaintiff and other Class members continue to own, on behalf of all members of the Class who continue to own such stock, in return for the consideration paid for that stock together with interest thereon.  Class members who have sold their Vitacost stock are entitled to rescissory damages.

36.     By reason of the conduct alleged herein, these Defendants violated, and/or controlled, a person who violated §12(a)(2) of the Securities Act.  Accordingly, Plaintiff and

members of the Class who hold Vitacost securities purchased in the IPO have the right to rescind

and recover the consideration paid for their Vitacost securities, and hereby elect to rescind and

tender their Vitacost securities to the Securities Act Defendants sued herein.  Plaintiff and Class

members who have sold their Vitacost securities are entitled to rescissory damages.

37.     This action is brought within three years from the time that the securities upon

which this Count is brought were sold to the public, and within one year from the time when

Plaintiff discovered or reasonably could have discovered the facts upon which this Count is

based.

## COUNT III
### FOR VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT
### AGAINST THE OFFICER AND DIRECTOR DEFENDANTS

38.     Plaintiff incorporates the allegations contained above pertaining to the false

Offering Documents.  Plaintiff repeats and alleges Sections I, II, III, VI.A., and XIII, as if fully

set forth herein.  This Count is brought against the Officer and Director Defendants, each of

whom was a controlling person of Vitacost by virtue of their position as directors and/or senior

officers of Vitacost and/or by virtue of their status as a major shareholder of the Company.

39.     This Claim is brought against the Officer and Director Defendants pursuant to

Section 15 of the Securities Act, 15 U.S.C. §77o, on behalf of all persons or entities who

purchased Vitacost stock issued pursuant or traceable to the September 24, 2009 IPO.

40.     The Company is liable under Section 11 of the Securities Act as set forth in

Count I herein with respect to the IPO.

41.     Each of the Officer and Director Defendants was a control person of the Company

with respect to the IPO by virtue of that individual's position as a senior executive officer and/or

director of the Company.  These Defendants each had a series of direct and/or indirect business

10

and/or personal relationships with other directors and/or officers and/or major shareholders of Vitacost.  By reason of their positions within the Company and/or their stock ownership and/or because of their positions on Vitacost's Board of Directors, the Officer and Director Defendants had the requisite power to directly or indirectly control or influence the specific corporate policy that resulted in the unlawful acts and conduct alleged in Count I.

42.     Each of the Officer and Director Defendants was a culpable participant in the violations of Section 11 of the Securities Act alleged in Count I above, based on their having signed the Offering Documents and having otherwise participated in the process that allowed the IPO to be successfully completed.  These Defendants, by virtue of their managerial and/or board positions with the Company, controlled the Company as well as the contents of the Offering Documents at the time of the IPO.  Each of the Officer and Director Defendants was provided with or had unlimited access to copies of the Offering Documents and had the ability to either prevent their issuance or cause them to be corrected.

43.     As a result, the Officer and Director Defendants are liable under Section 15 of the Securities Act for the Company's primary violation of Section 11 of the Securities Act.

44.     By virtue of the foregoing, Plaintiff and other members of the Class who purchased or otherwise acquired the Company's common stock pursuant and/or traceable to the IPO are entitled to damages against the Individual Defendants.

## V.     CLAIMS UNDER THE EXCHANGE ACT

### A.     PARTIES

#### i.     Plaintiff

45.     Plaintiff purchased Vitacost stock during the Class Period, and was damaged thereby.

### ii.    Defendants

#### (a)    The Company

46.    As described above, Defendant Vitacost is a Delaware corporation headquartered in Florida.

#### (b)    The Individual Defendants

47.    As described above, Defendant Kerker was Vitacost's Chief Executive Officer at all relevant times during the Class Period.

48.    As described above, Defendant Smith was Vitacost's Chief Financial Officer at all relevant times during the Class Period.

49.    For purposes of Plaintiff's Exchange Act claims, Defendants Kerker and Smith are referred to as the "Individual Defendants."

50.    Vitacost and the Individual Defendants are referred to as the "Exchange Act Defendants."  The Securities Act Defendants and the Exchange Act Defendants are collectively referred to as "Defendants."

51.    During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Vitacost, were privy to confidential, proprietary and material adverse non-public information concerning Vitacost, its operations, finances, financial condition and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

12

52.   The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Vitacost's business.

53.   The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and publicly disseminated documents alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

54.   As senior executive officers and/or directors and as controlling persons of a publicly traded company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and were traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Vitacost's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of Vitacost's securities would be based on truthful and accurate

information.   The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

55.     The Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Vitacost's publicly traded securities by disseminating materially false and misleading statements and/or concealing material adverse facts.

## VI.   <u>SUBSTANTIVE ALLEGATIONS</u>

### A.   <u>Factual Background</u>

56.     Defendant Vitacost operates as an online retailer and direct marketer of health and wellness products.   It offers dietary supplements, such as vitamins, minerals, herbs or other botanicals, amino acids, and metabolites, as well as cosmetics, organic body and personal care products, sports nutrition, and health foods.   The Company sells its products directly to consumers through its website, www.vitacost.com, as well as through catalogs.

57.     Vitacost offers approximately 30,000 products from 1,600 third-party brands, and its own proprietary brands, such as Nutraceutical Sciences Institute, Cosmeceutical Sciences Institute, Best of All, Smart Basics, and Walker Diet.   The Company's vitamin and mineral products include multi-vitamins; lettered vitamins, such as vitamin A, C, D, E, and B-complex; and minerals, including calcium, magnesium, chromium, and zinc.   Vitacost's herbal products comprise whole herbs, standardized extracts, herb combination formulas, and teas; and supplements consist of fatty acids, probiotics, anti-oxidants, phytonutrients, and condition-specific formulas.

B.     **False and Misleading Statements**

58.     The Class Period commences on September 24, 2009.  On that date, Vitacost filed with the SEC the Registration Statement for the IPO.  On or about September 24, 2009, the Prospectus with respect to the IPO, which forms part of the Registration Statement, became effective.  Both the Company and certain selling stockholders sold shares in the IPO.  The Company sold 4,428,445 shares, for proceeds of $49,421,446.  The selling stockholders, including certain of the Securities Act Defendants, sold 6,571,555 shares for proceeds of $73,338,553.

59.     As discussed above, the Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing its preparation.

60.     After the completion of the IPO, the Exchange Act Defendants continued to disseminate materially false and misleading statements concerning Vitacost.

61.     On November 4, 2009, Vitacost issued a press release in which it reported financial results for the third quarter and nine-month periods ended September 30, 2009. Therein, the Company stated:

> For the third quarter, net sales increased 32% to $48.4 million from net sales of $36.7 million for the third quarter of the prior year. Both of the Company's primary sales categories, propriety and third party products, contributed to this strong year-over-year increase by generating record third quarter results.

> Gross profit for the third quarter increased 71% to $15.1 million, compared to $8.8 million in the third quarter of the prior year. The Company's gross profit margin increased to 31.2% in the third quarter versus 24.0% in the third quarter of the prior year. Overall, gross profit margins improved by 720 basis points primarily due to transitioning manufacturing of proprietary capsules and tablets from third-party manufacturers to in-house manufacturing, increased purchasing power due to higher sales volume of third-party product, and the raw materials used for manufacturing our proprietary products.

Pro forma operating income for the third quarter was $4.2 million compared to $0.1 million in the same period a year ago. The Company's pro forma operating margin expanded to 8.7% from 0.0% for the same period last year. This improvement was due to strong net sales growth, leverage of sales and marketing expense, and the strength of the Company's proven business model. The company's GAAP operating loss, which includes a $10.9 million one-time non-cash stock-based compensation expense in connection with the recent initial public offering, was $(6.7) million in the third quarter of 2009 compared with $0.1 million in the third quarter of 2008.

Adjusted EBITDA (earnings before interest, taxes, depreciation, amortization and related non-cash compensation expense) for the third quarter of 2009 was $5.1 million, compared to $0.9 million in the previous year.

Pro Forma net income for the third quarter of 2009 was $3.1 million, or $0.13 per diluted share calculated on a weighted average fully diluted share count of 23.7 million shares, versus a net loss of $(0.1) million, or $(0.01) per diluted share, for the comparable period last year. The Company's GAAP net loss, which includes the $10.9 million one-time non-cash stock-based compensation expense in connection with the recent initial public offering, was $(3.8) million in the third quarter of 2009 or $(0.17) per diluted share, compared with a net loss of $(0.1) million or $(0.01) per diluted share in the third quarter of 2008.

"We are extremely pleased with our top-line growth, operating and manufacturing improvements, and strong operating cash flow for the third quarter and first nine months of this year. Third quarter net sales increased in our two primary net sales sources -- third party products and propriety products -- underscoring our expanding product offering as well as customer growth. Notably, both our propriety and third party sales achieved record results, driven by many factors including our superior customer value, product selection, and experience," said Ira Kerker, Vitacost's Chief Executive Officer. "Our business is well positioned for long-term profitable growth and margin expansion even as we continue to invest in our information technology and marketing strategies. Customer acquisition cost was $12.68 for the quarter and by offering the best value, superior customer service and timely and accurate delivery of leading products we expect our active customer base of over 1 million customers to continue growing for many years to come."

Nine Month Results

For the nine months ended September 30, 2009, net sales increased 34% to $141.5 million compared to $105.4 million in the same period last year.

Pro Forma operating income for the nine months ended September 30, 2009 improved to $16.1 million compared to $1.1 million in the same period last year. GAAP operating income, which includes the $10.9 million one-time non-cash

stock-based compensation expense in connection with the recent initial public offering, was $5.2 million compared to $1.1 million in the same period last year.

Operating cash flow was $14.3 million for the nine months compared to a $(0.9) million for the previous year nine-months and Adjusted EBITDA for the nine-months was $19.0 million compared to $3.4 million in the same period last year.

Free cash flow was $8.2 million for the nine months ended September 30, 2009 compared to $(5.5) million last year. (Free cash flow is calculated using net cash provided by operating activities less capital expenditures for property, plant and equipment).

Pro forma net income was $10.3 million, or $0.44 per diluted share, compared to net income of $0.6 million, or $0.02 per diluted share, in the same period last year. The Company's GAAP net income, which includes the $10.9 million one-time non-cash stock-based compensation expense in connection with the recent initial public offering, was $3.3 million or $0.14 per fully diluted share for the first nine months of 2009 compared with net income of $0.6 million or $0.02 per fully diluted share for the first nine months of 2008.

Successful Initial Public Offering

On September 24, 2009, the Company completed an initial public offering of its common stock at $12.00 per share and raised $132 million. The Company received approximately $47.1 million in net proceeds. The net proceeds to the Company from this offering are being used to repay existing indebtedness, approximately $20 million to fund capital expenditures such as purchasing fulfillment and manufacturing equipment and retrofitting and expanding the manufacturing and distribution facilities; and the balance for working capital, reducing notes payables and general corporate purposes.

Richard Smith, Chief Financial Officer, commented, "Our recent initial public offering combined with over $14.3 million of operating cash flow for the first nine months of this year enables us to complete our manufacturing expansion and continued investments in technological infrastructure. Our growing active customer base of over 1 million customers and the strength of our balance sheet have us well positioned for many years of future growth."

Balance Sheet

The Company ended the third quarter of 2009 with cash and cash equivalents of $48.4 million as of September 30, 2009. As of September 30, 2009, the Company had $7.7 million of notes payable.

Outlook

For the fourth quarter of 2009, the Company anticipates revenue of $48.0 to 49.0 million. Earnings per diluted share for the fourth quarter are expected to be in the range of $0.07 to $0.08. Weighted average shares for diluted EPS in the fourth quarter of 2009 are estimated to be approximately 29.5 million shares, compared to 23.7 million shares at the end of the third quarter 2009, primarily resulting from the issuance of shares in the Company's IPO.

For the full year ending December 31, 2009, the Company expects revenue of $189.5 to $190.5 million and pro forma earnings per diluted share of $0.50 to $0.51, excluding the non-cash stock-based compensation expense in connection with the recent IPO outlined above. Weighted average shares used to calculate diluted earnings per share for the full year ending December 31, 2009 are estimated to be approximately 25.1 million shares.

62.     On November 16, 2009, Vitacost filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2009.  The Company's Form 10-Q was signed by Defendant Smith and reiterated the Company's financial results.

63.     On February 18, 2010, Vitacost issued a press release in which it reported financial results for the fourth quarter and full year ended December 31, 2009.  Therein, the Company stated:

Fourth Quarter 2009 Results

For the fourth quarter of 2009, net sales increased 32% to $50.3 million from net sales of $38.2 million for the fourth quarter of the prior year. Both of the Company's primary sales categories, propriety and third party products, contributed to this strong year-over-year increase by generating record fourth quarter results.

Gross profit for the fourth quarter of 2009 increased 53% to $16.0 million, compared to $10.5 million in the fourth quarter of the prior year. The Company's gross profit margin increased 450 basis points to 31.9% in the fourth quarter versus 27.4% in the fourth quarter of 2008. Overall, the gross profit margin improvement was primarily due to transitioning manufacturing of proprietary capsules and tablets from third-party manufacturers in-house, and increased purchasing power with third-party distributors and raw material suppliers due to higher sales volumes.

Operating income for the fourth quarter of 2009 was $3.7 million compared to $0.5 million in the same period a year ago. The Company's operating margin expanded to 7.3% from 1.4% for the same period last year. This improvement was

due to strong net sales growth, leverage of sales and marketing expense, and the strength of the Company's proven business model.

Adjusted EBITDA (earnings before interest, taxes, depreciation, amortization and related non-cash compensation expense) for the fourth quarter of 2009 increased approximately 180% y/y to $5.4 million, compared to $1.9 million in the previous year. The Company's EBITDA margin increased 570 basis points to 10.7% in the fourth quarter versus 5.0% in the fourth quarter of 2008.

Net income for the fourth quarter of 2009 was $2.6 million, or $0.09 per diluted share calculated on a weighted average fully diluted share count of 28.5 million shares, versus a net loss of $0.6 million or ($0.02) per share for the comparable period last year. The Company had approximately 22.8 million shares outstanding pre IPO and issued approximately 4.4 million new shares for the IPO during the last week of September.

"We achieved record sales for the fourth quarter and full year of 2009 and are on track to deliver strong results in 2010. Fourth quarter net sales increased in our two primary net sales sources - third party products and propriety products - underscoring our expanding product offering as well as customer growth," said Ira Kerker, Vitacost's Chief Executive Officer. "The improved gross and operating margins during 2009 illustrate the leverage in our business model and with the planned expansion of our distribution and manufacturing facilities in 2010; we believe we are well positioned for increased sales, margin improvement and earnings growth for many years to come."

Full Year 2009 Results

For the full year of 2009, net sales increased 33.6% to $191.8 million compared to $143.6 million in the same period last year.

The Company's operating cash flow was $14.9 million for the full year of 2009 compared to a use of $0.6 million in 2008. Adjusted EBITDA was $24.4 million for the full year of 2009 compared to $5.3 million for the previous year.

Excluding the $10.9 million of one-time, non-cash stock option expense recorded in the third quarter, full year 2009 net income was $12.9 million, or $0.52 per diluted share, calculated on 24.7 million shares outstanding compared to breakeven net income or $0.00 per diluted share, for full year 2008. The Company's GAAP net income, which includes the $10.9 million of one-time, non-cash stock-based compensation expense in connection with the recent initial public offering, was $5.9 million or $0.24 per fully diluted share for the full year of 2009 compared with breakeven net income $0.00 per fully diluted share for the full year of 2008.

Balance Sheet

19

The Company ended the fourth quarter of 2009 with cash, cash equivalents, and short-term investments, of $44.4 million as of December 31, 2009.

Richard Smith, Chief Financial Officer, commented, "Our strong operating cash flow of $14.9 million for the full year of 2009 combined with our recent initial public offering has us well positioned to complete our distribution and manufacturing facility expansion as well as sufficient capital to increase our competitive advantage. For instance, we have utilized our infrastructure to increase the number of SKU's that we offer our customers to over 30,000 from 23,000 we had previously reported and we plan to end 2010 with approximately 60,000 SKU's."

Outlook

For the first quarter of 2010, the Company expects revenue to be in the range of $58 to $60 million. Earnings per diluted share for the first quarter are expected to be in the range of $0.14 to $0.15 per diluted share calculated with fully diluted shares outstanding of 28.9 million.

For the full year ending December 31, 2010 the Company expects revenue to be in the range of $245 to $255 million. The Company expects its net income to be in the range of $16.5 to $18.5 million which equates to an increase of 28% - 43% y/y, compared to the full year 2009 net income of $12.9M which excludes the one-time, non-cash stock compensation expense. The Company expects earnings per diluted share to be in the range of $0.56 to $0.63 calculated with fully diluted shares outstanding of 29.5 million.

The Company expects its EBITDA for the full year of 2010 to be in the range of $32.5 to $34 million with approximately $4.0 million of depreciation and amortization for the full year.

64.    On March 23, 2010, Wayne Gorsek, the Company's founder and former chief executive officer, sold 4,787,788 of his shares to Great Hill Equity Partners III, L.P. and Great Hill Equity Partners IV, L.P. in a Share Purchase Agreement.

65.    On March 24, 2010, Vitacost issued a press release wherein it announced the following:

Vitacost.com, Inc. (Nasdaq: VITC), a leading online retailer and direct marketer of health and wellness products, today announced that its board of directors approved the adoption of a stockholder rights plan. Under the rights plan, Vitacost.com's board of directors declared a dividend distribution of one

20

preferred stock purchase right for each outstanding share of common stock held by stockholders of record as of the close of business on March 24, 2010.

The rights are intended to enable the board of directors to best protect, under the totality of circumstances prevailing at this time and for the foreseeable future, the Company and the best interests of all holders of its common stock. The issuance of the rights is not intended to prevent a sale of control of the company that is determined by the board of directors to be fair, advisable and in the best interests of the Company's stockholders.

Each right will entitle the holder to purchase 1/1,000th of a share of the Company's newly created Series A Junior Participating Preferred Stock, at an initial exercise price of $45.00 per 1/1,000th of a share (subject to adjustment). The rights will become exercisable only if a person or group acquires 15% or more of the Company's outstanding common stock (subject to certain exceptions), and thus becomes an "acquiring person" under the rights plan, or announces or commences a tender or exchange offer the consummation of which would result in ownership by a person or group of 15% or more of the outstanding common stock.

If any person becomes an acquiring person, an acquiring person engages in certain "self-dealing" transactions with the Company specified in the rights plan (including if the Company is the surviving corporation in a merger with an acquiring person and the Company's common stock is not changed or exchanged) or, while there exists an acquiring person, an event occurs which results in the acquiring person's ownership interest in any class of securities of the Company being increased by more than 1% (such as a reverse stock split) (each of these events, a "flip-in" event), each right will entitle its holder (other than such acquiring person or group of affiliated or associated persons and certain transferees) to receive, upon exercise of the right, a number of shares of the Company's common stock (or, in certain circumstances, cash, property or other securities of the Company) equal to the exercise price of the right divided by 50% of the current market price of the common stock as of the date of the occurrence of the event.

In addition, after a person becomes an acquiring person, if the Company is acquired in a merger or other business combination transaction in which the Company's common stock is exchanged or converted or in which the Company is not the surviving corporation, or sells 50% or more of its assets or earning power, each right would entitle its holder (other than such acquiring person or group of affiliated or associated persons and certain transferees) to purchase, upon payment of the then current exercise price of the rights, a number of shares of common stock of the acquiring person equal to the exercise price of the rights divided by 50% of the current market price of such common stock at the date of the occurrence of the event.

At any time prior to the earlier of the first occurrence of a "flip-in" event and the expiration of the Rights, the rights are redeemable for $0.0001 per right at the option of the board. Following the time that a person becomes an acquiring person and prior to an acquisition of 50% or more of the Company's common stock, the board may, in its discretion, effect the mandatory exchange of the rights (other than rights owned by the acquiring person) at an exchange ratio of one share of common stock per right.

If not previously exercised, redeemed or exchanged, the rights will expire on the earlier of (i) the close of business on March 24, 2015 or (ii) the thirtieth (30th) day following the Company's 2012 annual meeting, if the approval of the Company's stockholders does not occur at such meeting. Until the rights become exercisable, outstanding common stock certificates, together with a summary of the rights, will evidence the rights.

The adoption of the rights plan and the distribution of the rights is not dilutive, does not affect reported earnings per share or the Company's financial results, and is not taxable to holders of the Company's common stock.

66. On March 30, 2010, Vitacost filed its annual report in Form 10-K with the SEC. The Company's Form 10-K was signed by the Individual Defendants and reiterated the Company's financial results.

67. The statements described above were each materially false and misleading when made because they failed to disclose and misrepresented the following adverse facts: (1) that the Company was starting a product-mix shift away from the high-margin proprietary products; (2) that the Company inflated demand for its proprietary products; (3) that the Company was pushing out excess product to customers so that it could mask declining demand; (4) that the Company was experiencing logistical issues at its own plants; (5) that the Company lacked significant oversight processes and procedures and utilized ineffective operations software, despite knowing that those issues existed; (6) that as a result of this, the Company's financial results were materially inflated at all relevant times; (7) that the Company lacked adequate internal and financial controls; and (8) that the Company's projections regarding future growth lacked in any reasonable basis when made.

C. **The Truth Comes To Light**

68. On April 20, 2010, after the close of the market, Vitacost issued a press release in which it announced updated guidance for revenue and fully diluted earnings per share for the first quarter ending on March 31, 2010 and full year 2010. Therein, the Company stated:

> During the latter half of the first quarter, back orders temporarily increased on select NSI proprietary products primarily due to a manufacturing logistics issue at its Lexington, NC plant. As a result, the Company estimates that $1.0 to $1.2 million of revenue will shift from the first quarter to the second quarter as the Company recognizes revenue when orders are delivered and not shipped. As a result, the Company now expects revenue in the range of $57.0 to $57.5 million for the first quarter of 2010, with fully diluted earnings per share in the range of $0.08 to $0.09. The Company's prior guidance was for revenue in the range of $58 to $60 million and earnings per diluted share in the range of $0.14 to $0.15. The revised earnings per share guidance is attributable to the lower-than-expected revenue and a product mix shift with an increased percentage of revenue stemming from lower margin third party product sales. In addition, gross margin in the quarter was also impacted by increased shipping expenses to maintain the Company's high level of customer service and an increase in the level of promotional activity in order to mitigate the expense of moving inventory from the Company's former distribution center in North Las Vegas to the newly opened facility in South Las Vegas.
>
> Accordingly, the Company is revising its full year 2010 estimates and now expects revenue to be in the range of $235 to $245 million with full year earnings per share in the range of $0.40 to $0.50. Previously, the Company's full year guidance was for revenue in the range of $245 to $255 million and earnings per share in the range of $0.56 to $0.63.
>
> "While we are disappointed with our first quarter preliminary results and have prudently revised our full year expectations, we believe these issues are short-term in nature and the Company has taken the necessary steps to correct the situation and eliminate the production bottleneck by the end of the second quarter," said Ira Kerker, Vitacost.com's Chief Executive Officer. "We have made some personnel changes in manufacturing, and are in the process of implementing new scheduling software to enhance visibility and efficiency of the scheduling process. In addition, we have adopted additional oversight procedures to ensure that this situation is not repeated in the future."
>
> Mr. Kerker continued, "Our business model remains sound and taking into consideration the revenue that has now shifted into the second quarter - we would have reported revenue within our previously stated range. We believe the Company is well positioned for long-term profitable growth and margin

expansion as we continue to achieve greater efficiencies and cost savings and note that our new Las Vegas distribution center opened on schedule. As the leading online retailer of health and wellness products, Vitacost remains focused on offering its customers superior value and quality on the best selection of products."

69.     Vitacost's announcement shocked the market.   On this news, the Company's share price plummeted over 24% from the prior day's closing price of $12.56 per share, finally closing at $9.54 per share on reported volume of over 6 million shares, an increase of over twenty times average daily reported volume.

70.     On April 22, 2010, Rick Aristotle Munarriz of the Fool.com wrote an article entitled: "Throw This Stock Away."  Therein, the author stated:

When Vitacost went public seven months ago, I had my doubts about an online retailer in the cutthroat vitamin game. But there were three things that drew me to embrace Vitacost as a debutante.

The e-tailer was growing quickly, with sales up 36% through the first six months of 2009.  Vitacost was quite profitable -- and growing.  Despite my fears of competitive pricing, roughly a third of its sales came from its proprietary Nutraceutical Sciences Institute (NSI) products, so it had an exclusive hook into the masses.  Well, let's jump all the way to this week's financial update.

It all started out as an acceptable logistical slip. There was a manufacturing issue at the plant, forcing $1 million to $1.2 million in back orders from being recognized in the first quarter to the current quarter. Earnings would also take a hit in the first quarter.

That's cool. It's all a zero-sum game in the end, right?

Nope. The company is also talking down its guidance for all of 2010. It now sees $235 million to $245 million in net revenue, $10 million below its original outlook. Whoa! Where did that come from?

Vitacost is talking down its earnings outlook, too, in part because of a product-mix shift away from the high-margin proprietary products that intrigued me in the first place. Vitacost is now expecting to earn between $0.40 and $0.50 a share this year.

That's less than the charge-adjusted $0.52 a share it rang up a year ago. Vitacost was trading above its $12 IPO before the grim report. It's a cardinal rule for IPOs

24

to perform well during their first few quarters as public companies. Financial hiccups early on can scare away investors who start to believe that going public was just an exit strategy on the company's behalf.

Vitacost seemed to be doing just fine, but this week's bombshell changes the thesis. The e-tailer is going to win back Wall Street's faith, and that's the kind of stuff that you can't get in a bottle.

71.     As a result of Defendants' wrongful course of conduct, Vitacost shareholders have lost millions of dollars in their investment in the Company.

## VII.     THE EXCHANGE ACT DEFENDANTS' LIES AND OMISSIONS

72.     Vitacost's statements and filings during the Class Period were materially false and misleading because they failed to disclose: (1) that the Company was starting a product-mix shift away from the high-margin proprietary products; (2) that the Company inflated demand for its proprietary products;  (3) that the Company was pushing out excess product to customers so that it could mask declining demand; (4) that the Company was experiencing logistical issues at its own plants; (5) that the Company lacked significant oversight processes and procedures and utilized ineffective operations software, despite knowing that those issues existed; (6) that as a result of this, the Company's financial results were materially inflated at all relevant times; (7) that the Company lacked adequate internal and financial controls; and (8) that the Company's projections regarding future growth lacked in any reasonable basis when made.

73.     In addition to the false and misleading statements described in detail herein, Defendants also failed to disclose the truth regarding Vitacost's financial condition.  Specifically, and in addition to the other omissions described herein, Defendants failed to tell the public the true risks the Company faced with regard to its business operations and manufacturing facilities, and failed to disclose that the Company was operating with inadequate internal and financial controls.  As a result, Vitacost's reported financial results were materially false and misleading.

## VIII.   UNDISCLOSED ADVERSE INFORMATION

74.     The market for Vitacost's securities was an open, well-developed and efficient market at all relevant times.  As a result of the materially false and misleading statements and failures to disclose described herein, Vitacost's securities traded at artificially inflated prices during the Class Period.  Plaintiff and the other members of the Class purchased or otherwise acquired Vitacost's securities relying upon the integrity of the market price of Vitacost's securities and market information related to Vitacost, and have been damaged thereby.

75.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Vitacost's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Such statements and omissions were materially false and misleading in that they failed to disclose material adverse non-public information and misrepresented the truth about the Company, its business and operations, as alleged herein.

76.     At all relevant times, the material misrepresentations and omissions particularized herein directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and the other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements about Vitacost's business, prospects and operations.

77.     These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Vitacost and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' false and misleading statements during the Class Period resulted in

Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## IX.    SCIENTER ALLEGATIONS

78.    As alleged herein, the Exchange Act Defendants acted with scienter in that the Exchange Act Defendants knew that the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

79.    As set forth herein, the Exchange Act Defendants, by virtue of their receipt of information reflecting the true facts regarding Vitacost, their control over, receipt and/or modification of Vitacost's allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning Vitacost, participated in the fraudulent scheme alleged herein.

80.    Moreover, in the IPO, Vitacost insiders, including certain Defendants, sold 3,247,233 of their personally held shares for total proceeds of $36,239,120, as follows:

| VITACOST IPO INSIDER SALES | | | | |
|---|---|---|---|---|
| **Insider** | **Position** | **Shares Sold** | **Price Per Share** | **Total Proceeds** |
| Wayne Gorsek | Chief Operations Architect and Founder | 2,350,000 | $11.16 | $26,226,000 |
| Allen Josephs, M.D. | Director of Research/Board Member | 458,468 | $11.16 | $5,116,503 |
| Ira Kerker | Chief Executive Officer/Board Member | 89,804 | $11.16 | $1,002,213 |
| Sonya Lambert | Vice President of Marketing | 34,194 | $11.16 | $381,605 |
| Lawrence Pabst, M.D. | Board Member | 128,772 | $11.16 | $1,437,096 |
| Richard P. Smith | Chief Financial and Accounting Officer | 53,831 | $11.16 | $600,754 |
| Robert G. Trapp, M.D. | Board Member | 132,164 | $11.16 | $1,474,950 |
| **Total** | | **3,247,233** | **$11.16** | **$36,239,120** |

81.    The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and

27

complicity of the personnel at the highest level of the Company, including the Individual Defendants.

## X.     STATUTORY SAFE HARBOR

82.     The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  Furthermore, many of the statements pleaded herein were not identified as "forward-looking statements" when made, or indicated that actual results "could differ materially from those projected."  Nor were there any meaningful cautionary statements identifying important factors that could cause actual results to differ materially from the statements made therein.

83.     Defendants are liable for the forward-looking statements pleaded because, at the time each of those forward-looking statements was made, Defendants knew the forward-looking statement was false and the forward-looking statement was authorized and/or approved by an executive officer of Vitacost who knew that such statement was false when made.

## XI.    LOSS CAUSATION

84.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Vitacost's securities and operated as a fraud or deceit on Class Period purchasers of Vitacost's securities by failing to disclose to investors that the Company's financial results were materially misleading and misrepresented material information.  When Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of Vitacost's securities fell precipitously as the prior inflation came out of the Company's stock price.  As a result of their purchases of Vitacost's securities during the Class Period, Plaintiff and the other Class members suffered economic loss.

85.     By failing to disclose the true state of the Company's business prospects and growth strategy, investors were not aware of the true state of the Company's financial status. Therefore, Defendants presented a misleading picture of Vitacost's business and prospects. Thus, instead of truthfully disclosing during the Class Period the true state of the Company's business, Defendants caused Vitacost to conceal the truth.

86.     Defendants' false and misleading statements had the intended effect and caused Vitacost's common stock to trade at artificially inflated levels throughout the Class Period. However, as a direct result of the Company's problems coming to light, Vitacost's common stock price fell over 24% percent immediately following the announcement of the Company's true financial state.   This drop removed the inflation from the price of Vitacost's securities, causing real economic loss to investors who purchased the Company's securities during the Class Period.

87.     The decline in the price of Vitacost's common stock after the truth came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.   The timing and magnitude of Vitacost's common stock price decline negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.   The economic loss suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Vitacost's securities and the subsequent decline in the value of Vitacost's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

XII.   **APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE**

88.    At all relevant times, the market for Vitacost stock was an efficient market for the following reasons, among others:

a.    Vitacost securities met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient market;

b.    As a regulated issuer, Vitacost filed periodic public reports with the SEC and the NASDAQ;

c.    Vitacost securities were followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace; and

d.    Vitacost regularly issued press releases which were carried by national newswires.  Each of these releases was publicly available and entered the public marketplace.

89.    As a result, the market for Vitacost securities promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in Vitacost's stock price.  Under these circumstances, all purchasers of Vitacost securities during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices and a presumption of reliance applies.

XIII.   **CLASS ACTION ALLEGATIONS**

90.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons who purchased or otherwise acquired Vitacost securities during the Class Period and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, members of the immediate family of each of the

Individual Defendants, any subsidiary or affiliate of Vitacost and the directors, officers and employees of the Company or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

91.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members of the Class located throughout the United States.  Throughout the Class Period, Vitacost securities were actively traded on the NASDAQ (an open and efficient market) under the symbol "VITC".  As of April 30, 2010, the Company had approximately 27.48 million shares outstanding.  Record owners and other members of the Class may be identified from records maintained by Vitacost and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

92.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

93.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

94.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.      whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b.      whether Defendants participated in and pursued the common course of conduct complained of herein;

c.      whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period, including the Offering Documents, misrepresented material facts about the business, finances, financial condition and prospects of Vitacost;

d.      whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of Vitacost;

e.      whether the market price of Vitacost common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f.      the extent to which the members of the Class have sustained damages and the proper measure of damages.

95.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

## XIV.   COUNTS AGAINST DEFENDANTS UNDER THE EXCHANGE ACT

### COUNT IV
**For Violations Of §10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against the Exchange Act Defendants**

96.     Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.  This claim is asserted against the Exchange Act Defendants.

97.     During the Class Period, Vitacost and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Vitacost common stock; and (iii) cause Plaintiff and other members of the Class to purchase Vitacost stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, the Exchange Act Defendants, and each of them, took the actions set forth herein.

98.     These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Vitacost securities in violation of §10(b) of the Exchange Act and Rule 10b-5.  The Exchange Act Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  The Individual Defendants are also sued herein as controlling persons of Vitacost, as alleged herein.

99.     In addition to the duties of full disclosure imposed on the Exchange Act Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to

promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

100.    Vitacost and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Vitacost as specified herein.  These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Vitacost's value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Vitacost and its business, operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Vitacost's securities during the Class Period.

101.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the Individual

Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's operational and financial projections and/or reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

102.     These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Vitacost's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its stock.  As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

103.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Vitacost securities was artificially inflated during the Class Period.  In ignorance of the fact that the market price of

Vitacost shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Exchange Act Defendants, upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by the Exchange Act Defendants but not disclosed in public statements by these Defendants during the Class Period, Plaintiff and the other members of the Class acquired Vitacost securities during the Class Period at artificially inflated high prices and were damaged thereby.

104.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of Vitacost, which were not disclosed by the Exchange Act Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired Vitacost securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

105.    By virtue of the foregoing, Vitacost and the Individual Defendants each violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

106.    As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT V
### For Violations of §20(a) of the Exchange Act
### Against the Individual Defendants

107.   Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.  This claim is asserted against the Individual Defendants.

108.   The Individual Defendants were and acted as controlling persons of Vitacost within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

109.   In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

110.   As set forth above, Vitacost and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other

37

members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XV.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for judgment as follows:

a)    Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)    Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c)    Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d)    Awarding such other relief as this Court deems appropriate.

## XVI.   **JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: May 24, 2010

**SAXENA WHITE P.A.**

By: */s/ Lester R. Hooker*

Maya Saxena (Fla. Bar No. 0095494)
msaxena@saxenawhite.com
Joseph E. White III (Fla. Bar No. 0621064)
jwhite@saxenawhite.com
Christopher S. Jones (Fla. Bar No. 00306230)
cjones@saxenawhite.com
Lester R. Hooker (Fla. Bar No. 0032242)
lhooker@saxenawhite.com
2424 N. Federal Highway, Suite 257
Boca Raton, FL 33431
Tel: 561 394-3399
Fax: 561 394-3082

**Ryan & Maniskas, LLP**
Katharine M. Ryan
Richard A. Maniskas
995 Old Eagle School Rd., Ste. 311
Wayne, PA 19087
Tel:  (484) 588-5516
Fax:  (484) 450-2582

***Attorneys for Plaintiff***